Merrimack,
No. 4477.

MERCHANTS MUTUAL CASUALTY CO.

*v.*

MICHAEL A. CAPOBIANCO *& a.*

Argued April 3, 1956.

Decided May 31, 1956.

*George P. Cofran* and *Paul A. Rinden* (*Mr. Rinden* orally), for the plaintiff.

*Sulloway, Jones, Hollis & Godfrey* and *Irving H. Soden* (*Mr. Soden* orally), for the defendant Warren.

*Upton, Sanders & Upton* for the defendants Capobianco, furnished no brief.

GOODNOW, J. The principal claim of the plaintiff involves subsection (b) (2) of insuring agreement V of the policy in question which provides that "use of other automobiles" coverage shall not apply "to any automobile while used in the business or occupation of the named insured." By its exceptions, the plaintiff raises the issue of whether the Trial Court correctly interpreted this policy provision in reaching its conclusion that Capobianco, the named insured in this case, was not using the government truck in his business or occupation at the time of the accident.

The basis for the Trial Court's conclusion on this question is stated in its findings and rulings as follows: "The operation by insured of the government truck in an emergency to furnish power to the Concord Hospital when no regular truck driver was available . . . was not work in which the insured was regularly or usually engaged." From this language it is apparent that the Court interpreted the policy as being applicable only as to "work in which the insured was regularly or usually engaged." With this interpretation we cannot agree.

In *Bowen* v. *Casualty Co.*, 99 N. H. 107, in which this same policy provision was considered, the insured was the self-employed proprietor of an ice delivery business. At the time of the accident in which he was involved, he and his brother, who owned and operated a gravel truck, had temporarily exchanged jobs because of the insured's physical inability to make ice deliveries. The issue presented in that case was whether ice delivery or gravel delivery was the "business or occupation" of the insured at the time of the accident. As applicable to a determination of that question, the following statement was made in the opinion: "The words 'business' and 'occupation' . . . are each commonly used in reference to the work in which one is regularly or usually engaged." This language was not intended as a conclusion that as to work performed by an insured in connection with his employment, the words "business or

occupation," as used in this policy provision, should apply only to the precise type of work in which he was regularly or usually engaged. See *Merchants &c. Cas. Co.* v. *Tuttle*, 98 N. H. 349, in which the truck operated by the insured was "sometimes . . . used 'a couple of times in one day or it might be a couple of months before they used it again' " and the same policy provision was held to be applicable.

The policy is to be given the meaning which a reasonable person in the position of the insured would give to it. *Farm Bureau Ins. Co.* v. *Manson*, 94 N. H. 389, 392. The duties of an occupation are not ordinarily thought of as being limited to the performance of those acts regularly and usually required by the work but are generally understood to include those additional acts the need for the performance of which arises only infrequently but which are nonetheless a part of the occupation. Acts which are essential to the proper and full performance of the duty owed to the employer are a part of the occupation whether the need for their performance arises regularly or only occasionally.

Capobianco's occupation was that of a general mechanic at the concentration site in the State military reservation. This was the classification in which he was employed, the activity upon which he spent the major portion of his time and out of which he made his living. *Bowen* v. *Casualty Co.*, 99 N. H. 107, 115. His regular duties, as stated in an office memorandum from the U. S. Property and Disbursing Officer for New Hampshire, made him responsible for "the receipt of material into the concentration site, preparation for storage, storage, in-storage maintenance, operation of battery maintenance room and maintenance records connected with equipment assigned to the concentration site." At this site about five hundred military vehicles of various kinds were normally stored and maintained, subject to requisition for use off the reservation by National Guard units throughout the state. All of these vehicles were in Capobianco's charge for maintenance and storage while on the reservation. As an incidental duty not reduced to writing, Capobianco drove the vehicles on the reservation for testing and repair purposes. When vehicles were to be driven off the reservation for any purpose, they were regularly operated by truck drivers employed at the reservation for that purpose. Capobianco was not classified as a truck driver and it was not a part of his regular duty to drive these vehicles on the public highway.

In addition to his responsibilities in connection with the storage

and maintenance of equipment, however, the Trial Court found that it was "Capobianco's duty in his work to obey the orders of his superior, Captain Murphy." As the Captain testified, "being his superior, he would carry out an order that I gave him . . . He was expected to comply with my order." It was "part of his duty." The Court also found that Capobianco "had a right to drive off the reservation when so ordered by his superiors" and the testimony indicates that he had in fact done so about once a month, during the three years he had been employed at the reservation, the occasion for his doing so being, as he testified, "when there is a shortage of drivers."

On the day of the accident, Capobianco was not engaged in his regular work at the concentration site because of the storm but he was on duty and being paid. All the truck drivers employed at the reservation were at summer camp with the National Guard. When the call was received from the hospital, Captain Murphy, as the Trial Court found he "had a right to" do, ordered "Capobianco to take the generator to the . . . hospital." The emergency nature of the mission is without significance. Emergencies requiring the operation of trucks off the reservation were "infrequent" according to Captain Murphy. Thus, even a classified truck driver operating the truck on the day of the accident would have been performing work other than that in which he was regularly or usually engaged. The important fact is that "at the time of the accident, Capobianco was driving the army truck . . . in compliance with an order of his superior," an authorized order which he had a duty to obey, and was receiving his regular pay for so doing. Under these circumstances no reasonable person in Capobianco's position would consider that such use of the truck was not a part of his occupation. The Trial Court's conclusion of law that he was using it "in another line of endeavor" and not in his occupation cannot be supported.

Attached to the policy was a "New Hampshire Statutory Motor Vehicle Liability Policy Endorsement" by the terms of which coverage for use of other vehicles was provided within the statutory limits, without regard to whether the use was in the business or occupation of the insured. While the plaintiff's responsibilities under this endorsement were not determined by the Trial Court, the necessary facts are before us and justice and convenience require that this phase of the case be disposed of at this time. *Farm Bureau Ins. Co.* v. *Manson*, 94 N. H. 389, 391.

The plaintiff's contention that no coverage is afforded by this endorsement because of the provisions of RSA 268:26 is without merit. As indicated in *Milwaukee Insurance Co.* v. *Morrill,* 100 N. H. 239, the fact that the truck which Capobianco was operating was owned by the federal government does not make inapplicable the coverage afforded by the endorsement. While Capobianco was a member of the National Guard it conclusively appears from the evidence that he was not "engaged in military duty pursuant to orders from proper authority" at the time of the accident and the statute does not operate to relieve the plaintiff from its obligations under the endorsement.

A judgment should be entered that the plaintiff is required to furnish coverage under the endorsement up to the required minimum statutory limits, but is under no obligation to do so beyond those limits because of the provisions of agreement V (b) (2) of the policy.

*Remanded.*

KENISON, C. J., dissented; the others concurred.